IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JACKIE CARTER,

                           Plaintiff,                    OPINION AND ORDER

        v.                                               14-cv-512-wmc

ZIEGLER, PISCHKES, HASON, JAMES,
MELBY, LIESER, MEISNER, HAUTAMAKI,
MORGAN, GREER, ANDERSON, and DR.
CORRELL,

                  Defendants.

        In this lawsuit, prisoner Jackie Carter was granted leave to proceed on claims for

First Amendment retaliation and Eighth Amendment deliberate indifference against

defendants, all of whom are (or at least were) employees of the Wisconsin Department of

Corrections ("DOC").  During all times relevant to his complaint, defendants worked at

Columbia Correctional Institution or in DOC's central office in Madison.  Before the

court is defendants' motion for summary judgment on both of plaintiff's claims.  (Dkt.

#32.)

        In response to defendants' motion for summary judgment, Carter filed a two-page,

cursory response, purporting to "give all facts and instructions to facts as brief[ly] as

possible." (Pl.'s Opp'n (dkt. #53).)   This approach, however, falls woefully short of the

court's guidelines on summary judgment, which require a plaintiff to respond to

defendant's proposed findings of fact by numbered paragraph.  (Pretrial Conf. Order

(dkt. #20) pp.16-24.)  Although Carter is an experienced, frequent filer in this court, and

surely knew that more was expected, the court is sympathetic to his position as a *pro se*

plaintiff, and will view his submission liberally, including reviewing materials attached to his complaint and filed independent of any motion or response to defendants' motion. Even so, Carter's claims fail as a matter of law.[1]  Accordingly, the court will grant summary judgment to defendants.

## UNDISPUTED FACTS

**A. Summary Judge Record**

Instead of responding to plaintiff's proposed findings of facts as called for by local procedure, Carter asks this court to review the "many affidavits from witnesses that [were] threatened and forced to remove their names from my witness list or be put in solitary confinement," which he filed at the same time as his complaint.  (Pl.'s Opp'n (dkt. #53) 1.)  In October 2015, also before defendants' filed their motion for summary judgment, Carter filed affidavits from four of the inmates who signed an August 2013 letter addressed below.  (Dkt. ##23-26.)  The court will describe the contents of those affidavits in the facts below.

Carter also purports to rely on inmate complaints attached to his declaration to show that he was "injured by the defendants."  (Pl.'s Opp'n (dkt. #53) 1.)  As well as "how [defendants] worked in concert in subjecting [him] to retaliatory attacks." and "that each defendant knew what was going [on], participated in and did absolutely

---

[1] The court also considered whether recruitment of counsel to respond to summary judgment for Carter would likely have made any difference on summary judgment, but has concluded that this is unlikely in light of:  (1) the court's decision as a matter of law that Carter did not engage in protected conduct with respect to his First Amendment retaliation claim; and (2) the undisputed medical record submitted by defendants, coupled with the court's prior rulings on Carter's Velcro footwear challenge, with respect to his Eighth Amendment claim.

nothing to stop [his] pain and suffering." (*Id.*)[2]  If defendants were denying knowledge of Carter's complaints, these complaints and defendants' responses to the complaints would certainly be sufficient to raise a genuine material issue of fact, but for purposes of their summary judgment motion, defendants concede that Carter complained about the disciplinary action based on the group petition and about his claim of denial of prescribed footwear and medication.   These documents do not, however, contradict defendants' evidence that:   (1) Carter was disciplined for a legitimate reason; and (2) Carter was not denied footwear or medication.   After resolving all material factual disputes and reasonable inferences in plaintiff's favor as the non-moving party, the court finds the following facts material and undisputed, unless otherwise noted below.

**B.  The Parties**

At all times relevant to this lawsuit, plaintiff Jackie Carter was an inmate housed at Columbia Correctional Institution ("CCI").[3]  Defendant Sandra Hautamaki currently is employed by the Wisconsin Department of Corrections ("DOC") as Deputy Warden at Redgranite Correctional Institution, but was the Deputy Warden at CCI from June 30, 2013, to January 2016.  In her capacity as CCI Deputy Warden, Hautamaki had duties

---

[2] Carter also purports to have "other pages of evidence that proves each defendant was notified," but that he cannot send these documents at this time because he lacks postage. (Pl.'s Opp'n (dkt. #53) 2.)  Since defendants do not dispute that Carter made them aware of his grievances, those documents are unnecessary for purposes of this motion.

[3] Defendants propose several facts demonstrating Carter's extensive use of the inmate complaint process, as well as requests for and utilization of health services.  In particular, defendants set forth facts showing that his demands became so numerous CCI has implemented procedures specific to Carter, including weekly blood pressure checks and review of his correspondence by the Unit Manager unless addressed to the Health Services Unit, Psychological Services, or the Inmate Complaint Office.  (Defs.' PFOFs (dkt. #34) ¶¶ 30-39.)

and responsibilities to help develop, implement and administer the security, treatment and support services of the institution. She was not, however, qualified to provide medical services. She instead relied on the institution's Health Services Unit ("HSU") to provide diagnostic and treatment services.

Defendant Don Morgan is employed by DOC as an Administrative Captain at CCI. He has been employed in that position since October 2010, functioning as the assistant to the Security Director, providing general supervision and direction to all correctional staff and shares in the responsibility for the ongoing safety, supervision and treatment of inmates. Like Hautamaki, Morgan is not qualified to provide medical services, and relies on HSU to provide diagnostic and treatment services.

Defendant Michael Meisner is currently employed as the Warden at Redgranite, but was the Warden of CCI from April 24, 2011, to March 23, 2014. In the latter capacity, he was responsible for the overall administration and operation at CCI. Meisner, likewise, was not qualified to provide medical services, and he relied on HSU to provide diagnostic and treatment services.

At all times relevant to this lawsuit, defendant Karen Anderson was employed as the HSU Manager at CCI. In that capacity, Anderson's responsibilities included managing and supervising of health care services, developing procedures, monitoring care plans, preparing required reports, and providing liaison activities to other institution units and community health care providers. Anderson had access to all inmate medical charts and would oversee and respond to health services requests. While Anderson did not provide direct treatment to Carter, she was present in the room occasionally when

4

Carter was seen by HSU staff.  Even so, Anderson did not have the authority to override or alter orders issued by credentialed health care professionals, nor did she have the ability to write prescriptions.

Defendant James Greer is the Director of the Bureau of Health Services within the Division of Adult Institutions for the DOC.  Greer has held this role since November 18, 2002.  As Director, Greer develops and implements policies for delivery of health services, prepares budgets, directs staff and reviews inmate complaints regarding the provision of health services at the correctional institutions.  Greer is not a physician, and he does not provide direct care to inmates at CCI; rather, medical care is provided by physicians, nurse practitioners, physician assistants, registered nurses and licensed practical nurses.

Defendant Timothy Ziegler has been employed as a Unit Manager at CCI since August 1, 2011.  At all times relevant to this lawsuit, Ziegler was the Unit Manager of Unit 2, which housed Carter from January 7, 2012, through August 30, 2013.  As Unit Manager, Ziegler supervises correctional officers and correctional sergeants, and provides overall direction and operation of his assigned units.  He also has the responsibility for the supervision and general treatment of inmates under his charge.

### C. Law Library Access Complaint

#### i. Overview of Library Access

Inmates on Unit 2 are allowed to sign up for their choice of either recreation or library on Tuesdays from 2:30 p.m. to 4:00 p.m. and 5:00 p.m. to 7:30 p.m., Thursdays

from 2:30 p.m. to 4:00 p.m. and 7:15 p.m. to 8:45 p.m., and on Saturdays from 9:30 a.m. to 11:00 a.m.   (On Saturdays, however, inmates can attend both recreation and library.)   In an attempt to make it fair, the unit switches off which wing is allowed to sign up first.   There is a limit of 10 inmates per unit allowed to attend library at one time during the week and a limit of 23 during the weekend.   In addition, if an inmate has a pending lawsuit, however, he may write a letter to the librarian requesting extra time.

### ii.   August 2013 Letter

On or about August 14, 2013, Ziegler, as the Unit Manager, received a letter written by Carter and signed by 14 other inmates, stating:

> We are being denied the opportunity to go to the law library every week to every other week.   If we don't run, rush, maneuver and race to sign up for the law library, we won't be put on the list and have to try again next week to win the race.   The elder[ly] and partially disabled individuals don't [have] a chance.   Madison previously stated in a decision that the utility officers are suppose[d] to escort and accommodate the other/extra prisoners instead of denying those of us that don't win the race to sign up -- But it appears that the new officers are unaware of this.   Please help us correct this First Amendment violation.

(Ziegler Aff., Ex. 112 (dkt. #47-1) p.1; *see also* Ziegler Aff., Ex. 113 (dkt. #47-2) p.10 (original copy without names crossed out).)

Having never received such a group complaint, Ziegler determined that an investigation was required.   Between August 23 and 30, Ziegler interviewed the 14 other inmates.   Ziegler represents that the inmates informed him that Carter circulated the document and solicited signatures in the dayroom.   Each inmate asked to have their signatures removed from the document, making statements such as, "I want nothing to

do with this," and "I don't go to the library." (Ziegler Decl. (dkt. #47) ¶ 10.) As evidenced by the document filed with the court, each of the other fourteen inmates lined out his name, dated and initialed the document. (Ziegler Decl., Ex. 112 (dkt. #47-1) p.1.) Ziegler further represents that the inmates told him that they did not have a problem accessing the law library, and that they signed the document because Carter asked them to do so. (*Id.*)

As described above, Carter submitted affidavits from four of the inmates who had signed the August 2013 letter. The first inmate averred that he signed the letter because he never knew when he could make the law library list. (Dkt. #23.) He further states that he told Ziegler and a sergeant that he agreed with the content of what was written, but was told that "there is something wrong with my name on a petition with a group of people, and if I didn't take my name off, I would get a ticket for violating DOC policies and would go to the hole." (*Id.*) While, the affiant states that he knew that group complaints were authorized, he took his name off because "I didn't want to take the chance of going to the hole, knowing it would cost me valuable law library time." (*Id.*) The second and third affidavits are both dated January 29, 2014, and appear to have been written by Carter, but are each signed by inmates who had signed onto the August 2013 letter. (Dkt. ##24, 25.) The affiants attest that they each removed their respective names because Ziegler and Sergeant Pischkes threatened to put then in solitary confinement if they did not do so. (*Id.*) Finally, the fourth affidavit, dated May 4, 2014, was also apparently drafted by Carter, but signed by an inmate who attests that he

7

removed his name because of Ziegler and Pischkes' threat to put him in solitary confinement.  (Dkt. #26.)

On August 30, 2013, Carter was placed in temporary lockup pending completion of the investigation of the group grievance.  Ziegler also checked the Unit 2 library and recreation scheduled and found that on August 15, August 20, and August 27, Carter had attended recreation in lieu of law library; on August 22 and 24, Carter attended library; and on August 23, Carter was offered an opportunity to go to special library, but he refused.  (Defs.' PFOFs (dkt. #34) ¶ 51 (citing Ziegler Decl., Ex. 112 (dkt. #47-1) 2-39).)

On September 18, Carter filed an offender complaint, alleging that the inmate complaint examiner ("ICE") did not send him a return receipt to the group complaint regarding law library obstruction.  (Alsum-O'Donovan Decl., Ex. 105 (dkt. #36-1) 1-2.) The examiner responded as follows:

> ICE examined the inmate[']s ICRS file and notes Inmate Carter has not provided this office with any group complaint since the first of the year.  ICE spoke with the ICE PA and she notes never seeing a group complaint from Inmate Carter.

(*Id.* at p.2.)

### iii.   Group Petition Prohibition

Under Wis. Admin. Code § DOC 310.10, inmates are allowed to submit a group complaint through the Inmate Complaint Review System ("ICRS") if they share a concern raised in that complaint.  The administrative code, however, prohibits a group "petition or statement":

> An inmate who does any of the following is guilty of group resistance and petitions:
>
> . . .
>
> **(2)** Joins in or solicits another to join in any group petition or statement. The following activities are not prohibited:
>
> (a) Authorized activity by groups approved by the warden.
>
> (b) Group petitions to the courts.
>
> (c) Complaints properly prepared under ch. DOC 310.
>
> . . .

Wis. Admin. Code § DOC 303.24.[4]

Defendants maintain that Carter's circulation and submission of his August 2013 letter to Unit Manager Ziegler was a group petition prohibited by § 303.24. In particular, defendants argue that because Carter failed to submit the letter to the ICRS, it was not an allowed group complaint under § 310.10 (or contemplated by § 303.24(2)(a)).

### iv.   Disciplinary Action

Department staff *must* write a conduct report when, on the basis of their observation and other obtained information, they conclude that an inmate has violated a prison disciplinary rule. Wis. Admin. Code § DOC 303.67. On September 6, 2014, Ziegler issued Carter a conduct report for violating § DOC 303.24 (then § DOC 303.20), and Wis. Admin. Code § DOC 303.31 (then § DOC 303.27) which prohibits lying. (Ziegler Decl., Ex. 113 (dkt. #47-2) pp.11-12.) Ziegler avers that he issued the conduct

---

[4] This provision now is codified at § 303.24, but in 2013 -- the time relevant to Carter's complaint -- the same provision was codified at Wis. Admin. Code § DOC 303.20.

report because Carter:  (1) initiated the group grievance letter and solicited other inmates to sign it; and (2) had been given the opportunity to attend law library at times he claimed otherwise, but instead chose to attend recreation.  Ziegler further avers that he did not issue conduct reports to other inmates because they all reported during his investigation that they only signed the letter at Carter's request.

A disciplinary hearing was conducted on September 16, which Carter refused to attend despite being given the opportunity to offer testimony in his defense.  Carter did, however, provide a statement, describing his efforts to comply with the process for filing a group complaint.  (Ziegler Decl., Ex. 113 (dkt. #47-2) pp.17-19.)  Ziegler was not a member of the disciplinary committee.

The disciplinary committee determined that Carter more likely than not intentionally (1) engaged in an unsanctioned group petition and (2) lied by stating that inmates are being denied access to the law library.  (*Id.* at p.13.)  More specifically, the committee determined that Carter's written statement that he attempted to file a group complaint was not credible:

> By sending the petition to Mr. Ziegler, he was not going through the institution complaint system.  He claims that his petition was sent back to him from the ICE and that is when he sent it to the unit manager.  We do not believe this as he did not submit any evidence to support this (i.e., the rejection note from the ICE).

(*Id.*)

The committee gave Carter a disposition of 120 days disciplinary separation, which Carter appealed.  (*Id.* at pp. pp.1-6.)  Defendant Hautamaki reviewed Carter's

appeal and affirmed the disciplinary action, concluding that the evidence supported the finding of guilt and that the penalty imposed was appropriate.  (*Id.* at p.1.)

### D. Medical Treatment Complaint

In the second half of 2013, Carter was regularly seen by HSU for problems with his feet and blood pressure.  To put these frequent visits in context, however, Carter was scheduled in May of 2010 to be seen by nursing staff for weekly/bi-weekly meetings with physician appointments scheduled at least monthly, regardless of any special request in order to encourage Carter to decrease his submission of voluminous correspondence to HSU.  (Anderson Decl. (dkt. #42) ¶ 14.)

### i.    Complaints primarily concerning footwear and related pain

As this court is well familiar from his earlier lawsuits, Carter has a history of chronic foot pain and has been approved to use various feet and ankle supports, including:  knee-high compression or Thrombo-Embolic Deterrent ("TED") stockings, custom foot orthotic inserts from a podiatrist, high-top size 15 state-issued boots, ace wrap for his ankle, and high-top athletic shoes from an approved vendor.   Due to security and safety concerns, personal shoes cannot be worn in the restrictive housing unit (formerly known as segregated housing).  Accordingly, Carter was given high-top Velcro shoes to be worn in segregation.  HSU had previously reviewed these shoes and found them to be adequate for Carter's use.  Moreover, in other lawsuits brought by Carter, this court has held that defendants did not act with deliberate indifference in issuing him the Velcro footwear.  *See also Carter v. Radtke*, No. 09-cv-437, slip. op. at 14

(W.D. Wis. May 30, 2013) (dkt. #153); *see also Carter v. Meisner*, No. 12-cv-574, slip. op. at 15-16 (W.D. Wis. Oct. 31, 2014) (dkt. #98).

At the time Carter was placed in segregation on August 30, 2013, pending the investigation of his group letter, he was again issued the high-top shoes with Velcro closures.  On September 6, Carter was seen by HSU.  The progress note at that time indicates some mild swelling in Carter's lower legs, and that Carter was using detergent to clean them.  (Waterman Decl., Ex. 110 (dkt. #48-1) p.8.)

On September 20, Carter was seen by a nurse in HSU for leg ulcers on both legs. Notes from that visit indicate Carter reported not taking his blood pressure meds for two and a half months and not wearing his compression stockings because of the open wounds.  (*Id.* at pp.3, 8.)  A memorandum sent to Carter summarizing his appointment informed him that he was scheduled to see the doctor to assess his swelling and wounds in his lower legs, as well as to discuss why he wasn't taking his blood pressure medications.  (*Id.* at p.26.)  The nurse also noted that she was sending him supplies to treat his wounds, and she advised him to take his medication and wear compression stockings.  (*Id.*; *see also id.* at p.3.)

On September 24, Carter was again seen in HSU.  Among other things, the note indicates that Carter had open ulcers on his legs, and that TED stockings had been ordered, but Carter claims that he does not have them.  (*Id.* at p.3.)  The note further describes a plan of dressing the open sores and wearing knee-high TED stockings.  (*Id.*) On September 30, Carter's blood pressure was checked again.

On October 16, Carter was seen by a nurse for a sick call with complaints of foot and ankle pain. Among other things, the note indicates: "Pt was not wearing ace bandage as ordered for support. Pt was not wearing teds as ordered. No custom foot orthotics as ordered per podiatry present in current shoes. Pt encouraged to do foot soaks daily, apply hydrophor 2x/day. Pt encouraged to not wrap feet in kerlix." (*Id.* at p.7.) These same instructions were also sent to Carter in a memo summarizing 10/16 appointment. *Id.* at p.24.)

In addition, the patient note indicates that the chart was being sent "to MD for new order for non-laced ankle supports. Laundry and warehouse contacted to replace shoes." (*Id.* at p.7.) That same day, the special needs committee also approved a basin for Carter to use for the recommended foot soaks. (*Id.* at p.29.)

Just two days later, on October 18, Carter was seen again by a nurse complaining that his left foot was swollen and painful. (*Id.* at p.4.) And again, Carter was not wearing his TED stockings, ace bandages or foot orthotics. Carter reported that he had returned his TED stockings and orthopedic inserts to HSU. The nurse issued him two new ace bandages and two new pairs of knew-high TED stockings. (*Id.* at p.5; *see also id.* p.23 (memo sent to Carter describing 10/18 appointment and follow-up).)

Three days later, on October 21, Carter was seen by a physician regarding foot pain and his requests for ankle supports / footwear. Because the laced-up ankle supports were not allowed in segregation, the notes reflect that Carter acknowledged the Velcro fastened ankle support would help. (*Id.* at p.2.) That day, the special needs committee

approved Velcro, ankle supports for Carter's use, which were issued to him on October 26.  (*Id.* at pp.1, 29.)

On November 1, however, Carter refused the supports, signing a refusal acknowledgement.  (*Id.* at p.19; *see also id.* at p.1 (noting refusal on 11/4/13 as well).) That same day, HSU Manager Karen Anderson sent Carter a memo indicating that the doctor and she were both aware of his continued concerns:

> You are having regular scheduled HSU appointments. Prescriptions and interventions for the pain you describe have been issued, but are very often refused because of side effects or a number of other reasons.  You have had recent x-rays and the results have been reviewed with you.  Appropriate orders have been written.

(*Id.* at p.22.)  Carter had additional HSU encounters on November 3, November 11, November 18, November 26 and December 16.  (*Id.* at p.1.)

On December 18, 2013, Carter was seen again by a physician, who indicated that Carter "may order high top tennis shoes.  If none available in catalog[,] may order from outside vendor.  Purchase must be cleared with security.  Cost may exceed $75.  This is not an ok for vanity shoes."  (*Id.* at p.11; *id.* at p.21 (special needs form).)

### ii.    Complaints primarily concerning blood pressure medication

Given Carter's history of high blood pressure, he was also seen regularly by HSU physicians and nurses to manage his condition and prescribe blood pressure medications. On July 8, 2013, Carter was seen by a physician with complaints of headaches after taking Lisinopril for his high blood pressure.  The doctor ordered a new prescription for Losartan to address Carter's problems with high blood pressure, and he also continued to

monitor Carter's blood pressure weekly.  Carter filled that prescription on July 11 for 30 pills, he did not refill the Losartan order again until September 12.

Carter's blood pressure was checked on August 5 and 12.  He was offered a chart review by HSU on August 20 as well, but refused.  Carter was seen again on September 6.  At that time, Carter indicated that he had not been taking the Losartan because it also caused "too many side effects," including headaches, that HSU will schedule "MD appt. on BP meds."  (Waterman Decl., Ex. 110 (dkt. #48-1) p.8.)  At his September 20 appointment, Carter again reported that he was refusing to take Losartan because he did not like the side effects.  (*Id.*)  Yet again, on September 24, Carter reiterated that he was refusing to take the Losartan, and also signed a refusal to that effect.  (*Id.*)  In the meantime, HSU continued to monitor his blood pressure.

On October 7, a physician discontinued Carter's use of Losartan, instead prescribing a new blood pressure medication called Atenolol.  (*Id.* at pp.14, 25.)  Carter filled this prescription on October 8, for 14 pills, and again on October 26, for 30 more pills.  During this period, HSU staff continued to monitor Carter's blood pressure with checks on October 16, October 18, October 21, November 4, November 11, and November 18.

### iii.    DOC's central office response

During this same period of time in the fall of 2013, Carter was also regularly writing to the Bureau of Health Services for DOC.  As the Bureau's Director, defendant Greer received letters from Carter on October 2, 4 and 11, 2013, with complaints about

various medical concerns.  Greer also forwarded the letters to the nursing coordinator for

review and response.  On October 25, the nursing coordinator responded:

> In review of your medical record, I found that you now have
> an order for cuff in front (10/7/2013) and for a back brace
> (10/22/2013).     You recently had x-rages performed
> (10/22/2013).  The physician has seen you twice in October
> and you have also seen a nurse on two occasions during the
> month.  Other complaints in the correspondence have been
> previously addressed using the Inmate Complaint System.

(Greer Decl., Ex. 108 (dkt. #43-2).)

OPINION

In this lawsuit, Carter has been granted leave to proceed on two claims:  (1) a First

Amendment retaliation claim against defendant Ziegler, as Carter's general Unit Manager

at CCI; and (2) an Eighth Amendment deliberate indifferent claim against defendants

Greer, Anderson, Morgan, Meisner and Hautamaki, as Director of the HS Bureau for

DOC, HSO Manager of CCI, Administrator Captain at CCI, CCI Warden and Deputy

Warden, respectively.  Defendants move for summary judgment on both claims.

## I.  First Amendment Retaliation

In his complaint, Carter alleges that Ziegler issued him a conduct report, which

ultimately resulted in 120-day disciplinary segregation sentence, because Carter

complained about access to the law library in a group petition.  (Compl. (dkt. #1).)  As

the court explained in its order screening this claim to go forward, "[a]n act taken in

retaliation for the exercise of a constitutionally protected right violates the Constitution."

*DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000).  To prove a claim for retaliation,

16

however, Carter must demonstrate that:  (1) he was engaged in a constitutionally protected activity; (2) he suffered a deprivation that would likely deter a person from engaging in the protected activity in the future; and (3) the protected activity was a motivating factor in defendants' decision to take retaliatory action.  *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).  If Carter makes this initial showing, then the burden shifts to defendant to demonstrate that he would have taken the same actions "even in the absence of protected conduct."  *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).

For purposes of summary judgment, plaintiff's claim turns on the first element -- whether Carter was engaging in constitutionally protected speech.  "The determination of whether speech is constitutionally protected is a question of law for the court."  *Houskins v. Sheahan*, 549 F.3d 480, 489 (7th Cir. 2008) (citing *Connick v. Myers*, 461 U.S. 138, 150 n.10 (1983)).  As an initial matter, there is no dispute that Ziegler issued the conduct report because of Carter's 2013 letter, and a reasonable jury could find that a sentence of 120 days of disciplinary action would deter Carter from engaging in such speech going forward.  Moreover, whether defendant would have taken the same action even in the absence of protected conduct directly implicates the core issue of whether the August 2013 letter constituted protected activity.

As to this latter question, defendants rely on an administrative rule to guide the constitutional question at issue here.  As defendants acknowledge, the rule itself is subject to the familiar test in *Turner v. Safely*, 482 U.S. 78 (1987).  When a prisoner brings a claim under the First Amendment, the question is whether the challenged

restriction is reasonably related to a legitimate penological interest. *Turner*, 482 U.S. at 87. Four factors are relevant to that determination: (1) whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; (2) whether the prisoner retains alternatives for exercising the right; (3) the impact that accommodation of the right will have on prison administration; and (4) whether there are other ways that prison officials can achieve the same goals without encroaching on the right. *Turner*, 482 U.S. at 89-91.

Here, Carter argues -- or at least, he argued during the administrative appeal of his disciplinary action -- that the August 2013 letter delivered to Ziegler *was* a group complaint within ICRS, because he was told that the inmate complaint examiner and by the warden that "I was to first try to resolve the issue (law library obstruction) with the unit manager (Ziegler)." (Ziegler Decl., Ex. 113 (dkt. #47-2) 2 (Carter's written appeal of disciplinary action).) While the court credits Carter's statement that he was told to first attempt to resolve *his* complaints with an individual in a position to respond to his concern, Carter did not simply place Ziegler on notice of his concern, nor provide him a copy of a to-be-filed grievance, instead he gave him a letter signed by 15 inmates demanding action on the part of Ziegler.

Even if Carter had submitted a group complaint through the ICRS at the same time as he served the petition on Ziegler, and there is no proof he did, there is no dispute that Carter also submitted the group petition *outside of ICRS*. Perhaps this error might have been excused, rather than formally punished, but it is worth remembering that Carter is a sophisticated user of the offender complaint process, and he cannot credibly

18

claim a lack of understanding here.  Regardless, the defendants' "determination that the document was a petition and not a complaint is one of the 'difficult judgments concerning institutional operations' for which prison administrators receive deference, so long as the judgment was reasonable." *Felton v. Ericksen*, No. 08-CV-227-SLC, 2009 WL 1158685, at *8 (W.D. Wis. Apr. 28, 2009), *aff'd*, 366 F. App'x 677 (7th Cir. 2010) (quoting *Jones v. N. Car. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977)).

Having determined that defendant Ziegler acted within his discretion in finding a violation of the group complaint procedure requirement, the first, and core, question under *Turner* is whether the requirement that a group complaint or grievance be submitted through ICRS is reasonably related to a legitimate penological interest. Defendants contend that the requirement that a shared, group concern be submitted through ICRS is warranted by concerns about gang or other collective, illegal or coercive activity.  (Defs.' Br. (dkt. #33) 17-18.)  *See Felton*, 2009 WL 1158685, at *9 ("Unlike group complaints filed in the inmate complaint system, group petitions pose a security risk because they solicit participation in unsanctioned and unregulated inmate groups. The circulation of petitions can create circumstances in which some inmates coerce other inmates to participate against their will.").  Some of this concern appears to ring hollow given that, at least from the prisoners' perspective, soliciting signatures for an *authorized* group complaint would potentially implicate the same concerns about power dynamics and influence as soliciting signatures for a prohibited group petition.  Still, the court does not discount the assertion that requiring prisoners to operate within the confines of a

specific, sanctioned grievance process would provide some oversight and structure, thereby dampening concerns about gang-like activity.

More importantly, there is a meaningful difference between an authorized group complaint and a prohibited group petition from the perspective of the institutional recipient of the communication. A group complaint would be addressed to the institution as a whole, and screened by the ICE, with established standards guiding its review and consideration. A group petition, on the other hand, addressed to an individual prison employee, demanding a course of action, has the potential of undermining the delicate power dynamic at play in correctional institutions. *See May v. Libby*, Nos. 05-1473, 05-1647, 2007 WL 4226150, 256 Fed. App'x 925, at *3 (7th Cir. 2007) (unpublished) ("Banning petitions to maintain control over group activity by prisoners is a reasonable response to a legitimate penological concern."). As such, the court is satisfied that defendants have demonstrated that there is a valid, rational connection between the banning of unstructured group petitions to anyone inmates might choose to single out (or, stated another way, only allowing group complaints submitted through ICRS) and a legitimate, penological interest.

The other three *Turner* factors are also satisfied. With respect to the second factor -- whether there are alternatives for exercising First Amendment rights -- here, Carter could have either (1) submitted an individual letter to Ziegler *or* (2) filed an authorized group complaint. *See Duamutef v. O'Keefe*, 98 F.3d 22, 24 (2d Cir. 1996) (explaining that as long as individual grievance procedures are available prisons may bar circulation of petitions). In this way, plaintiff's claim implicates associational rather than speech rights,

and as the Supreme Court explained in *Jones*, "First Amendment associational rights . . . must give way to the reasonable considerations of penal management." 433 U.S. at 132. As a result, "numerous associational rights are necessarily curtailed by the realities of confinement." *Id.*

Finally, the third and fourth *Turner* factors, which concern the impact of accommodating group petitions on the prison and the availability of other ways to achieve the same result without encroaching the First Amendment, also support a finding that the prohibition of group petitions is reasonable. For the same reasons as explained above with respect to the first factor, the prison has a legitimate interest in controlling group activity, including group petitions. The DOC in crafting Wis. Admin. Code § 302.24(2) attempted to carve out some space for group speech. The court sees no basis to fault the DOC in how it drew the lines here, at least with respect to Carter's claim.

Accordingly, the court concludes that defendants have demonstrated that the prohibition of group petitions is reasonably related to a legitimate penological interest. In light of that finding, the court also concludes as a matter of law that Carter did not engage in protected conduct in directing the group petition to defendant Ziegler rather than the ICRS, and it will grant summary judgment to defendant Ziegler on plaintiff's First Amendment retaliation claim.

## II. Eighth Amendment Deliberate Indifference Claims

To survive summary judgment on his claim that defendants were deliberately indifferent to a serious medical need, Carter was required to proffer sufficient evidence

21

from which a reasonable jury could find that: (1) he had an objectively serious medical need; and (2) defendants was deliberately indifferent to it. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). As described above, Carter pursues these claims based on an alleged denial of medically-prescribed footwear and blood pressure medication while he was in segregation following his 120-day disciplinary segregation sentence.

In its order screening Carter's complaint to go forward, the court cautioned Carter that with respect to his claim based on footwear, he has no basis for claiming deliberate indifference if his claim concerns the provision of Velcro, rather than tie shoes or boots. (6/18/15 Op. & Order (dkt. #15) 9 n.3.) Given Carter's failure to respond to defendants' motion for summary judgment, and in particular, to their proposed findings of facts, it is difficult to discern whether Carter's claim touches on medical treatment separate from the provision of the Velcro footwear. Regardless, based on the record of his medical treatment with respect to leg and foot sores, swelling and pain, the court concludes no reasonable jury could find that defendants' conduct was so reckless as to constitute deliberate indifference to a serious medical need. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) ("[D]eliberate indifference is simply a synonym for intentional or reckless conduct, and that 'reckless' describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred.").

To the contrary, the record demonstrates that Carter received ongoing medical attention and several special needs accommodations, including compression stockings, orthotics, various ankle wraps, specialized footwear (including the Velcro shoes or boots for use while in segregation) and supplies for foot baths. Indeed, for the four-month

22

period from the end of August to the end of December, 2013, Carter had at least twelve HSU contacts concerning his feet and related medical needs. Admittedly, Carter ultimately received an accommodation of high-top athletic shoes; the approximate three-month delay in securing these shoes while HSU tried other medical options does not rise to the level of deliberate indifference, especially in light of HSU's continued efforts to address Carter's voluminous, ongoing concerns.

As discussed above, Carter also asserts a deliberate indifference claim based on the purported denial of blood pressure medication to him while in segregation. Here, too, the contemporaneous record presented by defendants does not support Carter's claim. The unchallenged evidence discussed above establishes that Carter was prescribed a new blood pressure medication (Losartan) in July of 2013 based on his complaint that his previous medication (Lisinopril) caused headaches. Despite this accommodation, Carter took the new medication sporadically, as evidence by the fact that a 30-day supply of pills lasted him closer to two months. By September, Carter admitted that he was not taking the Losartan, again complaining of side effects similar to his previous medication, including headaches. Approximately one month after his complaint about Losartan, Carter was prescribed yet another blood pressure medication (Atenolol). Apparently, Carter took that medication as prescribed, or at least he refilled the prescription two weeks after the initial 14-day supply. In addition to responding to Carter's complaints about side effects of blood pressure medication, the record shows that HSU was checking Carter's blood pressure on a weekly basis during the relevant period of time.

From all of this, no reasonable jury could find that defendants acted recklessly in their treatment of plaintiff's high blood pressure condition. *See Gayton*, 593 F.3d at 620 (defining subjective prong of deliberate indifference standard). Accordingly, the court will also grant defendants' motion for summary judgment on Carters' Eighth Amendment deliberate indifference claim.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #32) is GRANTED.

2) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 20th day of December, 2016.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge